ESTATE OF CHARLES RUSSELL BENNETT, DECEASED, EVA F. BENNETT AND DON R. PAXSON, CO-EXECUTORS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8052–89.        Filed February 1, 1993.

*Lester G. Fant III* and *John Wester,* for petitioner.

*Judy Jacobs Miller* and *Chalmers W. Poston, Jr.,* for respondent.

PARKER, *Judge:* Respondent determined a deficiency in petitioner's Federal estate tax of $2,716,879 and an addition to tax of $80,415.[1] The issue for decision is whether any portion of the Charles Russell Bennett Memorial Trust constitutes a "qualifying income interest for life" and hence qualifies for the marital deduction under section 2056(b)(7).

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the date of the decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

---

[1] The issues of valuation and the addition to tax for valuation understatement under sec. 6660 are decided in our separate Memorandum Opinion, T.C. Memo. 1993-34, filed this same date.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of facts and accompanying exhibits are incorporated herein by this reference.

Charles Russell Bennett (the decedent) was a citizen of the United States and a domiciliary of the State of Kansas when he died testate on August 27, 1985. Eva F. Bennett (Mrs. Bennett) is the surviving spouse of the decedent. She and Donald R. Paxson are the coexecutors of the Estate of Charles Russell Bennett (the estate or petitioner). At the time of filing of the petition, the coexecutors were both residents and domiciliaries of the State of Kansas. At all relevant times, the estate has been administered in the District Court for Shawnee County, Kansas, Probate Division.

In his will, dated June 6, 1984, the decedent made several specific bequests to Mrs. Bennett and others. The Charles R. and Eva F. Bennett Trust (the trust) was the residual beneficiary under the decedent's will.

The trust was an inter vivos trust created by an agreement dated June 6, 1984 (the trust agreement). The trustees named in the trust agreement were Charles Russell Bennett, Eva F. Bennett, Donald R. Paxson, Randolph G. Austin, and Gary Hale. Section 14 of the trust agreement provided for the appointment of successor trustees in the event of the death, incapacity, or resignation of one or more of the five named trustees. The trust was funded originally with 10,000 shares of Bennett Housing, Inc. stock, with a par value of $1 per share. The income of the trust was payable to the decedent during his lifetime. Upon his death, the trust was bifurcated into two separate trusts: the Charles Russell Bennett Family Trust (the family trust) and the Charles Russell Bennett Memorial Trust (the memorial trust). As of September 1985, the trustees of the family trust and the memorial trust were Mrs. Bennett, Donald R. Paxson, Randolph G. Austin, Gary Hale, and Doris Cole (the trustees).

The coexecutors of the estate timely filed a Form 706, U.S. Estate Tax Return, with the Internal Revenue Service Center in Austin, Texas. They claimed marital deductions under section 2056(b)(5) and (7) for the memorial trust. It has now been conceded that the estate is not entitled to a marital deduction under section 2056(b)(5).

The decedent's last will and testament (the will) is silent in regard to any marital deduction.[2] Paragraph 7 of the will, the residuary bequest, reads as follows:

7. RESIDUARY BEQUEST. My wife, Eva F. Bennett and I have established the CHARLES R. AND EVA F. BENNETT TRUST under that certain Trust Agreement dated June 6, 1984. All the rest, residue, and remainder of my estate, both real and personal, of whatever kind or character and wheresoever situated, I give and bequeath to Eva F. Bennett, Gary Hale, Randolph Gordon Austin and Don R. Paxson as Trustees under that certain Trust Agreement dated June 6, 1984. I specifically direct and provide that the property received by virtue of this bequest shall be held by said Trustees, to be administered by them in accordance with the provisions thereof, as a[n] addition to the trust fund, and said Trustees shall dispose of said property as a part of said Trust in accordance with the provisions thereof.

## The Family Trust

Under the terms of the trust agreement, the income of the trust was to be paid to the decedent during his life. Upon his death the trust was bifurcated into two separate trusts, the family trust and the memorial trust. The family trust received the largest amount that could pass free of Federal estate tax by reason of the unified credit and the State death tax credit. The trustees are required to pay the net income of the family trust to Mrs. Bennett during her lifetime; they also have the discretion to pay Mrs. Bennett the principal. If the income of the family trust exceeds her needs, the excess income may be paid to the remainder beneficiaries of the family trust. The four remainder beneficiaries of the family trust are Christine Bennett Anderson (the decedent's granddaughter), Mark Radcliff (the decedent's grandson), Melvin Kent Radcliff (the decedent's grandson), and Randolph Gordon Austin (the decedent's grandnephew).

Upon the death of Mrs. Bennett, or upon her failure to survive the decedent, the income of the family trust is payable to LaVera Radcliff (Ms. Radcliff), the decedent's daughter of his previous marriage. The trustees also have the power to invade the principal of the family trust for the benefit of Ms.

---

[2] Paragraph 9 of the will, the only provision mentioning taxes, reads as follows:

9. TAXES. It is my intention that all estate, inheritance, transfer and succession taxes including interest and penalties thereon shall be paid by the Trustees of the Trust Agreement dated June 6, 1984. To the extent such taxes are not paid by said Trustees, I direct that my executors pay all such taxes from my residuary estate.

Radcliff. If the income of the family trust exceeds Ms. Radcliff's needs, the excess income may be paid to the remainder beneficiaries. If both Mrs. Bennett and Ms. Radcliff die before the termination of the family trust, the income is payable to the four remainder beneficiaries.

The family trust is to terminate 20 years after the death of the decedent. However, if either Mrs. Bennett or Ms. Radcliff survives the decedent by more than 20 years, then the family trust is to terminate upon the death of Mrs. Bennett or Ms. Radcliff, whoever dies last. Upon termination of the family trust, the assets of the trust estate are to be distributed to the remainder beneficiaries. The estate does not claim a marital deduction in regard to the family trust.

*The Memorial Trust*

The memorial trust received the trust estate that remained after the funding of the family trust. The trustees are to pay the net income of the memorial trust to Mrs. Bennett during her lifetime.

Upon the death of Mrs. Bennett, a portion of the memorial trust will be splintered into the Eva F. Bennett Family Trust. The amount to be placed in the Eva F. Bennett Family Trust is the lesser of: (1) $600,000; (2) 10 percent of the value of the memorial trust at the date of Mrs. Bennett's death; or (3) the largest amount that can pass free of Federal estate tax by reason of the unified credit and the State death tax credit. Mrs. Bennett has the power to appoint the income and the beneficiaries of her family trust. The nonsplintered portion of the memorial trust will remain intact, and the income will be paid to the income beneficiaries of the family trust (i.e., first Ms. Radcliff, then the four remainder beneficiaries).

Both the Eva F. Bennett Family Trust and the memorial trust are to continue until the termination date of the family trust; that is, 20 years after the decedent's death, or, if Ms. Radcliff survives the decedent by more than 20 years, upon her death. Upon the termination of the memorial trust, the remainder will be divided into two portions and distributed. The first portion, containing 50 percent of the value of the memorial trust at the date of Mrs. Bennett's death, minus all amounts set aside for the Eva F. Bennett Family Trust, shall

be distributed to the persons appointed in Mrs. Bennett's will. The second portion, consisting of the remainder of the memorial trust's assets (including those amounts not specifically appointed to other persons by the will of Mrs. Bennett), shall be distributed to the four remainder beneficiaries of the family trust (i.e., the decedent's three grandchildren and a grandnephew).

### 1. *Medical Beneficiaries*

The third paragraph of the trust agreement provides that, should the trustees determine that Marquerite Laden (the decedent's niece), Katherine Bliss (the decedent's sister), or Norma Jean McCoubrey (the decedent's niece) is in need of funds, additional to each woman's then sources of income, to provide for the payment of medical care, hospitalization, or the cost of illnesses or accidents other than those of a routine nature, then the trustees are authorized to pay such costs out of the memorial trust. The trustees are also authorized, in their sole discretion, to pay expenses of the last illness, funeral, and burial of the same three persons out of the memorial trust. Paragraph 3 of the trust agreement, in its entirety, reads as follows:

3. PROVISION FOR MEDICAL CARE, HOSPITALIZATION AND FUNERAL EXPENSES FOR CERTAIN PERSONS. Should the Trustees at any time or from time to time determine that one or more of the persons named in this paragraph 3 is in need of funds additional to their then sources of income to provide for payment of medical care, hospitalization or the cost of illnesses or accidents other than those of a routine nature, then the Trustees are authorized to pay such costs to or on behalf of the named persons. The Trustees are authorized in their sole discretion to pay expenses of the last illness, funeral and burial of any of the persons named in this paragraph.

(a) The persons eligible for the benefits of this provision are: Marguerite [sic] Laden, Katherine Bliss and Norma Jean McCoubrey.

(b) The Trustees are authorized to make such payments from either the income or principal of the Charles R. Bennett Memorial Trust.

Paragraph 2(b)(2)(ii) of the trust agreement provides that the trustees are authorized to pay such medical, funeral, and burial benefits for those three individuals from either the net income or the principal of the memorial trust. The trust agreement provides that such payments shall be made from the principal of the memorial trust unless the trustees shall

determine, in their sole discretion, that the net income of the memorial trust is in excess of the needs of Mrs. Bennett.

## 2. *Educational Beneficiaries*

Paragraph 2(b)(2)(ii) of the trust agreement provides as follows:

(ii) Paragraph 3. of this Trust Agreement provides for medical care for certain named beneficiaries. Paragraph 4. of this Trust Agreement provides for educational benefits for certain named beneficiaries. The Trustees are authorized to pay such medical care or educational benefits from either the net income or the principal of the Charles R. Bennett Memorial Trust. Such payments shall be made from the principal of the Charles R. Bennett Memorial Trust unless the Trustees shall determine, in their sole discretion, that the net income of said trust is in excess of the needs of Eva F. Bennett. In exercising this discretionary power, the Trustees may but need not consider any other resources of Eva F. Bennett and shall give primary consideration to her needs.

The fourth paragraph of the trust agreement provides that the trustees are authorized to make provisions for the post-secondary education and training of the children, natural or adopted, of Christine Bennett Anderson, Mark Radcliff, Melvin Kent Radcliff, Randolph Gordon Austin, and Colinda Brenner (the decedent's grandniece). At the date of the decedent's death, there were five living educational beneficiaries, and two more were born in 1987 and 1989. Paragraph 4 (minus the subparts) reads as follows:

4. PROVISION FOR EDUCATION AND TRAINING FOR CERTAIN NAMED PERSONS. The Trustees are authorized to make provisions for the post-secondary education and training of the persons named in this paragraph. Such payments shall be in the sole and absolute discretion of the Trustees and shall be made from either the income or the principal of the Charles R. Bennett Memorial Trust. Such educational payments shall be in such amounts and proportions as the Trustees shall deem to be necessary or appropriate to or for the benefit of the persons named in this paragraph as the Trustees select in order to provide for: [enumeration of limitations on such education and training].

The costs of the educational benefits are to be paid out of the memorial trust. The amount of educational financial assistance to be given to any one beneficiary is to be determined by the trustees in their sole and absolute discretion. The trustees are authorized to make these educational payments from either the income or the principal of the memo-

rial trust. Paragraph 2(b)(1)(v) of the trust agreement provides that such educational payments also may be made from the family trust if the trustees determine that both trusts are best served by such payments. However, each educational beneficiary is limited to $10,000 per academic year, and $40,000 in total. The trustees may also lend money to a beneficiary for post-secondary educational expenses in excess of these limitations. The beneficiaries cease to be eligible for the educational benefits upon attaining the age of 35.

Paragraph 2(e) of the trust agreement gives the trustees the right to terminate any of the trusts and distribute the assets to the remainder beneficiaries should the trustees determine that the trust is of such small size that it is difficult to manage and does not accomplish the purposes for which it was established. Trusts with assets of less than $100,000 may be terminated in the trustees' sole discretion. Trusts with assets of $100,000 or more may be terminated only after a Shawnee County, Kansas, court determines it is in the best interests of all of the beneficiaries.

Paragraph 6(j) of the trust agreement provides that the trustees shall have the power to determine, in their absolute and uncontrolled discretion, all questions as to what is and what is not income and what expense, cost, taxes, and other charges shall be charged against income and what against corpus. In this respect, the trustees are specifically authorized "to determine in their sole and uncontrolled discretion whether payments on the principal of any obligation or [sic] the trust estate shall be charged to income or principal".

Paragraph 6(p) imposes a duty upon the trustees to use their best judgment and to act in good faith in exercising "the powers, discretions, and rights" conferred by the trust agreement.

Paragraph 11 of the trust agreement provides that, upon the death of the decedent and Mrs. Bennett, the trustees shall pay all taxes which shall properly be charged against the trust estate by reason of their death.[3] Paragraph 11 specifically provides:

---

[3] Initially, respondent contended that, even if one or more of the trusts otherwise qualified for the marital deduction, the corpus of each of the trusts must be reduced by the amount of taxes attributable to each trust. Respondent contended this reduction, in turn, would decrease

11. TAX PROVISION. Upon the death of Charles Russell Bennett or Eva F. Bennett, the Trustees shall pay all taxes which shall be properly charged against the trust estate by reason of the death of said Settlors. If any executor, administrator, or other person acting in a fiduciary capacity shall have paid any estate, inheritance, or succession tax upon or with respect to any or all of the trust estate required to be included in the gross estate of either of the Settlors, the Trustees shall reimburse such executor, administrator, or other person acting in a fiduciary capacity for the amount of such taxes.

Paragraph 12 of the trust agreement provides that the law of the State of Kansas shall govern the operation of the trust.

Nothing in the trust agreement specifically provides for a marital deduction.[4]

## 3. *Disclaimers*

### a. *Trustees' Disclaimers*

In May of 1986, the trustees of the family trust and the memorial trust signed a document entitled "Approval, Consent and Disclaimer of Provisions of Trust Agreement". This document sets forth the rules and by-laws of the trusts.

Article V, section 1, of the rules and by-laws provides that, during the lifetime of Mrs. Bennett, all payments for medical and educational benefits shall be charged to principal rather than income, unless Mrs. Bennett elects otherwise. The following persons consented to the provisions of Article V, sec-

the amount of the available marital deduction. The estate correctly points out on brief that the allocation of the Federal estate tax among beneficiaries is governed by State law. *Riggs v. Del Drago,* 317 U.S. 95, 97-98 (1942). The estate further points out that the Kansas Supreme Court has consistently interpreted provisions such as par. 11 of the trust agreement as imposing no estate tax obligations on that portion of the estate qualifying for the marital deduction. Thus, par. 11 would not diminish any marital deduction otherwise available to the estate. See, e.g., *Jackson v. Jackson,* 536 P.2d 1400, 1405 (Kan. 1975); *In re Estate of Rooney,* 349 P.2d 916, 918 (Kan. 1960). On reply brief, respondent agrees with this position.

[4]The words "marital deduction" appear only in passing in the provision for the maximum amount to go to either the Charles R. Bennett Family Trust (par. (2)(b)(1)) or to the Eva F. Bennett Family Trust (par. (2)(c)(1)(cc)). For example, par. (2)(b)(1) reads as follows:

(1). The Charles R. Bennett Family Trust shall receive a sum equal to the largest amount that can pass free of federal estate tax by reason of the unified credit and the state death tax credit (provided use of this credit does not require an increase in the state death tax paid) allowable to the estate of Charles Russell Bennett but no other credit and after taking account of dispositions under previous sections of this trust and any will which said Charles Russell Bennett may leave and property passing outside of this trust and any will which he may leave which do not qualify for the marital or charitable deduction and after taking account of charges to principal that are not allowable as deductions in computing his federal estate tax. For the purpose of establishing the sum disposed of by this section the values finally fixed in the federal estate tax proceeding relating to his estate shall be used. The Settlors recognize that no sum may be disposed of by this section and that the sum so disposed of may be affected by the actions of his executors in exercising certain tax elections.

tion 1, in separate documents: Mrs. Bennett (executed May 22, 1986), Ms. Radcliff (executed May 21, 1986), Melvin Kent Radcliff (executed May 22, 1986), Mark Radcliff (executed May 20, 1986), Christine Bennett Anderson,[5] and Randolph Gordon Austin (executed May 23, 1986).

On May 22, 1986, Todd Brenner and Bruce Brenner, as natural guardian for Jill Brenner, executed documents consenting to the provisions of Article V. On May 23, 1986, Steve Brenner also consented to the provisions of Article V. However, the consent of Todd Brenner was not received by Mr. Paxson until May 28, 1986. The record does not indicate that the other two living educational beneficiaries in 1986 (Heather Austin and Edward Austin) consented to the provisions of Article V.

Article V, section 2, of the rules and by-laws provides for the payment of medical insurance premiums for the three medical beneficiaries and limits the collective medical benefits, in excess of any insurance provided, that may be paid to the three medical beneficiaries to $400,000. Both sections 1 and 2 of Article V also state that "This By-Law shall not be amended during the lifetime of Eva F. Bennett."

Article VI, section 1, of the rules and by-laws provides that none of the trusts may be terminated during the lifetime of Mrs. Bennett or Ms. Radcliff:

The trust agreement provides for the termination of the trusts by the trustees under certain circumstances. This provision is intended to permit termination and distribution in the event that one or more trusts are created which are not of sufficient size to be effectively managed by trustees. The trustees believe that this provision was never intended to operate during the lifetime of either of the income beneficiaries since the distribution under this provision is to the remainder beneficiaries. The trustees specifically disclaim any power to terminate any trust created under this agreement during the lifetime of Eva F. Bennett or LaVera B. Radcliff. This By-Law shall not be amended during the lifetime of Eva F. Bennett or LaVera B. Radcliff.

The record does not indicate that Christine Bennett Anderson, Mark Radcliff, Melvin Kent Radcliff, and Randolph

---

[5] Christine Anderson resided in Texas in May of 1986. Her disclaimer supposedly was notarized on Tuesday, May 27, 1986, in Topeka, Kansas. However, Ms. Anderson testified that she does not recall when or where she executed the disclaimer. She thinks she was in Topeka for a weekend during May, but does not recall the exact timing of her visit. She does not recall if she signed the document in front of Doris Cole, the notary public, who was also an employee of Fairlawn and a trustee.

Gordon Austin, as the remainder beneficiaries, consented to the provisions of Article VI of the rules and by-laws.

### b. *Medical Beneficiaries' Disclaimers*

Norma Jean McCoubery, Katherine Bliss, and Marquerite Laden executed separate disclaimers stating:

I specifically disclaim, during the lifetime of Eva F. Bennett, any claim to reimbursement for medical, funeral and burial expenses in excess of $400,000 (cumulative amount for all three beneficiaries) other than expenses covered by contracts of insurance. I also consent, acknowledge and disclaim all rights to reimbursement for medical insurance premiums in excess of the income generated by said $400,000 for all three beneficiaries.

Ms. McCoubery executed her disclaimer on May 23, 1986, Ms. Bliss executed hers on May 23, 1986, and Ms. Laden executed hers on May 27, 1986. Mr. Paxson thought he received these disclaimers on or before May 27, 1986. Mr. Paxson also thought that he filed all of the disclaimers on May 30, 1986, with the District Court of Shawnee County, Kansas, Probate Division (the Shawnee County district court). However, the Shawnee County district court's records do not contain Ms. Laden's disclaimer.[6] The estate has failed to establish that Ms. Laden's medical disclaimer was ever filed with the Shawnee County district court.

### c. *Probate Court Order*

On May 30, 1986, Mr. Paxson filed with the District Court of Shawnee County, Kansas, a petition for confirmation of rules and disclaimers and partial payment for services (the petition). The petition refers to the trust agreement and requests four actions: (1) That the Shawnee County district court issue an order confirming the trustees' rules and by-laws; (2) that the Shawnee County district court issue an order confirming the disclaimers of the beneficiaries; (3) that the Shawnee County district court issue an order confirming the trustees' disclaimer of the power to terminate the trust

---

[6] At trial, this Court agreed to keep the record open to allow the estate's counsel to examine the Shawnee County district court's microfilm records to determine if Ms. Laden's disclaimer was misplaced during processing. The parties have stipulated that the Shawnee County district court's microfilm records do not contain a copy of Ms. Laden's disclaimer. The estate's counsel now contends that the disclaimer must have been misplaced between the time of filing and the time of microfilming. There is no evidence to support that speculation.

or trusts during the lifetime of Mrs. Bennett; and (4) that the Shawnee County district court authorize the partial payment of certain fees and expenses. On May 30, 1986, the Shawnee County district court issued an order for confirmation of rules and disclaimers and partial payment for services confirming the requests of the petition and authorizing the payment of certain fees and expenses.

d. *Educational Beneficiaries' Disclaimers*

In January and February of 1989, Christine Bennett Anderson, Mark Radcliff, Melvin Kent Radcliff, Randolph Gordon Austin, and Colinda Brenner signed disclaimers on behalf of the unborn or otherwise unidentified educational beneficiaries (their unborn, unadopted, or otherwise unidentified children). They disclaimed the beneficiaries' interest in the following fraction of the memorial trust: (1) The numerator is 37.5 percent of the amount determined by subtracting $200,000 from the value of the memorial trust as finally determined for estate tax purposes; (2) the denominator of the fraction is an amount determined by subtracting $200,000 from the value of the memorial trust as finally determined for estate tax purposes.

In March and April of 1989, Christine Bennett Anderson, Mark Radcliff, Melvin Kent Radcliff, Randolph Gordon Austin, and Colinda Brenner signed disclaimers on behalf of their unborn, unadopted, or otherwise unidentified educational beneficiaries. They disclaimed the beneficiaries' interest in the following fraction of the memorial trust: (1) The numerator is 50 percent of the amount determined by subtracting $200,000 from the value of the memorial trust as finally determined for estate tax purposes; (2) the denominator of the fraction is the amount determined by subtracting $200,000 from the value of the memorial trust as finally determined for estate tax purposes.

This second set of educational disclaimers covered a portion of the memorial trust in addition to the portions disclaimed in the first set.[7] On April 10, 1989, both sets of edu-

---

[7] The coexecutors explained that they combined the $40,000 maximum benefit available for each of the six living educational beneficiaries (at the time of the execution of the disclaimers, Amanda Anderson had not yet been born, but Sean Anderson had been born in 1987) and the two partial disclaimers for the potential beneficiaries to create an absolute maximum amount

cational disclaimers were filed with the Shawnee County district court. At the time these educational disclaimers were executed, there were six living educational beneficiaries: Christine Bennett Anderson had one child, Sean Anderson;[8] Randolph Gordon Austin had two children, Heather Austin and Edward Austin; and Colinda Brenner had three children, Steve Brenner, Todd Brenner, and Jill Brenner.

### Estate Tax Return

The estate claimed a $231,945 marital deduction with respect to the several specific direct bequests to Mrs. Bennett; this deduction has not been questioned by respondent. The estate also claimed a $3,278,785 marital deduction with respect to the properties bequeathed to the memorial trust, calculated as follows:

| | |
|---|---|
| Gross estate | $4,606,381 |
| Funeral expenses and debts of decedent | (27,253) |
| Adjusted gross estate | 4,579,128 |
| Bequests to Eva Bennett—marital deduction | (231,945) |
| Other specific bequests | (222,558) |
| Estate to family and memorial trusts | 4,124,625 |
| Estate to family trust | (177,442) |
| Estate to memorial trust | 3,947,183 |
| Present value of educational and medical benefits [1] | (200,000) |
| Trust corpus available for Mrs. Bennett | 3,747,183 |
| 50 percent life income and power of appointment [2] | (1,873,592) |
| Remainder of trust | 1,873,591 |
| Election under sec. 2056(b)(7) (QTIP) for 75 percent of qualifying portion [3] | (1,405,193) |
| Balance of trust not under election | 468,398 |

Total marital deduction claimed with respect to the memorial trust:

| | |
|---|---|
| Life income/power of appointment sec. 2056(b)(5) | $1,873,592 |

---

of educational benefits payable from the memorial trust (i.e., 12.5 percent of the memorial trust plus $240,000). However, only $200,000 was subtracted as the present value of both the educational and medical benefits, as shown in the calculations in the text below. No explanation was given for this discrepancy. At least $240,000 should have been subtracted for the six living educational beneficiaries whose rights were never disclaimed, and at least $400,000 should have been subtracted for the medical beneficiaries since they were at least entitled to medical insurance based on the income of $400,000 of principal as well as the $400,000 for medical, funeral, and burial expenses. See the calculations of the estate tax return set out in the text below.

[8] Christine Bennett Anderson's son Sean was born in 1987 and her daughter Amanda was born approximately 1 month after Mrs. Anderson executed the second disclaimer; i.e., born on May 23, 1989.

QTIP election sec. 2056(b)(7) ................................................ 1,405,193

Total .............................................................................. 3,278,785

[1] See *supra* note 7.

[2] Presumably, this referred to the 50 percent to be divided at the time the memorial trust terminated. The estate no longer claims that that qualifies for a marital deduction.

[3] Although only 37½ percent of the value of the trust was deducted based upon the QTIP election, the language on the return states that the election is for 75 percent of the qualifying portion. The return preparer appears to have been referring to 75 percent of the trust that remained after 50 percent of the trust was deducted pursuant to sec. 2056(b)(5) (75 percent of 50 percent is 37½ percent). The estate, having realized that the trust is not eligible for a deduction under sec. 2056(b)(5), now contends that the marital deduction election is for 75 percent of the value of the trust (after reduction by $200,000). Respondent does not object to this interpretation of the election. That is to say, if this Court finds that a portion of the trust is QTIP property, respondent agrees that a deduction should be allowed for 75 percent of that portion of the trust.

The statutory notice of deficiency disallowed the portion of the marital deduction that was claimed with respect to the memorial trust property, i.e., $3,278,785, on the grounds that the assets "do not qualify for the marital deduction".

OPINION

Section 2056(a) allows a marital deduction from a decedent's gross estate for the value of property interests passing from the decedent to a surviving spouse. However, a marital deduction is denied for a "terminable interest", that is, a property interest that will terminate or fail "on the lapse of time, on the occurrence of an event or contingency, or on the failure of an event or contingency to occur". Sec. 2056(b)(1). Thus, an interest in the nature of a life estate is ineligible for the marital deduction. *Estate of Nicholson v. Commissioner,* 94 T.C. 666, 671 (1990); *Estate of Higgins v. Commissioner,* 91 T.C. 61, 66 (1988), affd. 897 F.2d 856 (6th Cir. 1990).

However, the Economic Recovery Tax Act of 1981, Pub. L. 97-34, sec. 403(d), 95 Stat. 172, 302, added section 2056(b)(7), which allows a marital deduction for "qualified terminable interest property". This section allows a decedent to pass to the surviving spouse an interest in property for the spouse's lifetime without the decedent's losing the ability to control the disposition of that property upon the death of the surviving spouse.

Section 2056(b)(7)(B)(i) defines "qualified terminable interest property" as property (1) which passes from the decedent, (2) in which the surviving spouse has a "qualifying income interest for life", and (3) for which an election has been made.[9] A "qualifying income interest for life" is defined as:

> (ii) QUALIFYING INCOME INTEREST FOR LIFE.—The surviving spouse has a qualifying income interest for life if—
>> (I) the surviving spouse is entitled to all the income from the property, payable annually or at more frequent intervals, * * * and
>> (II) no person has a power to appoint any part of the property to any person other than the surviving spouse. [Sec. 2056(b)(7)(B)(ii).]

Thus, if a surviving spouse has a "qualifying income interest for life" within the meaning of section 2056(b)(7)(B)(ii), that interest is not treated as a terminable interest under section 2056(b)(1). The entire property, the life interest and the remainder, would be treated as passing to the surviving spouse and would qualify for the estate tax marital deduction. *Estate of Kyle v. Commissioner,* 94 T.C. 829, 839 (1990); H. Rept. 97-201 (1981), 1981-2 C.B. 352, 377-379.

For the purposes of the marital deduction, "property" includes an entire interest in property as well as a specific or identifiable portion of property (i.e., a fractional interest). Sec. 2056(b)(7)(B)(iii) and (iv); sec. 20.2056(b)-5, Estate Tax Regs. Therefore, if a taxpayer can identify a specific portion of a trust over which certain powers to invade do not extend, an otherwise permissible marital deduction is allowable for such portion. *Northeastern Pennsylvania National Bank & Trust v. United States,* 387 U.S. 213, 218-219 (1967); *Gelb v. Commissioner,* 298 F.2d 544, 549-551 (2d Cir. 1962).

Thus, this Court must determine whether or not Mrs. Bennett has a qualifying income interest for life in an identifiable portion of the memorial trust. Only then would the decedent's estate be eligible for a marital deduction for that portion.

---

[9] Sec. 2056(b)(7)(B)(v) provides that "An election under this paragraph with respect to any property shall be made by the executor on the return of tax imposed by section 2001. Such election, once made, shall be irrevocable." Schedule M of the estate's return included a timely and unequivocal election to deduct "75 percent of qualifying portion" of the trust estate under sec. 2056(b)(7) (the QTIP election). Respondent does not contest that a QTIP election has been made in this case.

Respondent asserts that Mrs. Bennett does not have a qualifying income interest for life in a portion of the memorial trust for five reasons: (1) The trustees of the memorial trust have the power to pay the medical and the educational benefits from the income of the trust; (2) the amount of the medical benefits is unlimited and, thus, the trustees have the ability to appoint the entire trust to someone other than Mrs. Bennett; (3) the number of potential educational beneficiaries is unlimited and thus, again, the trustees have the ability to appoint the entire trust to someone other than Mrs. Bennett; (4) the trustees have the power to terminate the memorial trust under certain circumstances; and (5) the trustees have the effective power to allocate income to principal and consequently to defeat Mrs. Bennett's income interest.

The estate concedes that, looking solely at the terms of the trust agreement, it would not be entitled to a marital deduction under section 2056(b)(7). However, the estate argues that, having become aware that some of the trust agreement provisions were inconsistent with the estate's eligibility for a marital deduction, the trustees executed documents disclaiming certain of their powers under the trust agreement. In addition, members of the Bennett family executed documents disclaiming certain trust benefits. The estate asserts that these disclaimers were executed in an effort to obtain a partial marital deduction for the estate and are valid under section 2518 and Kansas law. The estate concedes that these measures do not cure any defects in the estate's eligibility for a deduction under section 2056(b)(5). However, the estate asserts that these documents do effectively cure defects in the trust agreement to permit a partial deduction under section 2056(b)(7) for a specific portion of the memorial trust.

Section 2518 authorizes the disclaimer of an interest in property. Section 2518(a) provides that "if a person makes a qualified disclaimer with respect to any interest in property, this subtitle shall apply with respect to such interest as if the interest had never been transferred to such person". Section 2518(b) defines a "qualified disclaimer" as follows:

the term "qualified disclaimer" means an irrevocable and unqualified refusal by a person to accept an interest in property but only if—

(1) such refusal is in writing,

(2) such writing is received by the transferor of the interest, his legal representative, or the holder of the legal title to the property to which the

interest relates not later than the date which is 9 months after the later of—

    (A) the day on which the transfer creating the interest in such person is made, or

    (B) the day on which such person attains age 21,

    (3) such person has not accepted the interest or any of its benefits, and

    (4) as a result of such refusal, the interest passes without any direction on the part of the person making the disclaimer and passes either—

    (A) to the spouse of the decedent, or

    (B) to a person other than the person making the disclaimer.

Thus, a trust that was not eligible initially for a marital deduction may become eligible if the persons with interests in the trust that jeopardize the marital deduction, other than the surviving spouse, effectively disclaim their interests. Section 20.2056(d)-1(b), Estate Tax Regs., provides:

(b) *Disclaimer by a person other than a surviving spouse.* If an interest in property passes to one other than the surviving spouse from a decedent in a taxable transfer made after December 31, 1976, and—

(1) The person other than the surviving spouse makes a qualified disclaimer with respect to such interest in property, and

(2) The surviving spouse is entitled to such interest in property as a result of such disclaimer, the disclaimed interest is treated as passing directly from the decedent to the surviving spouse. If the disclaimer is not a qualified disclaimer, the interest in property [is] considered as passing from the decedent to the person who made the disclaimer as if the disclaimer had not been made. See section 2518 and the corresponding regulations for rules relating to a qualified disclaimer.

Thus, in this case, we must first determine the validity of the trustees' renunciation of certain powers and the beneficiaries' disclaimers of certain benefits. Then, if the renunciation of powers and the disclaimers are valid, we must consider whether or not a portion of the memorial trust meets the requirements of section 2056(b)(7).

*Trustees' Renunciation of Certain Powers*

Respondent has advanced several alternative arguments in this case. However, respondent's argument that the trustees cannot renounce certain powers by the rules and by-laws executed after the decedent's death, if accepted, would seem to be wholly dispositive. In that case, no portion of the memorial trust would be eligible for a marital deduction. Even if we were to assume that the disclaimers by the medical and the educational beneficiaries were valid, the possibil-

ity that the memorial trust could be terminated by the trustees in their discretion or the possibility that the trustees could allocate income to principal would be sufficient to wholly defeat any qualifying income interest for life for Mrs. Bennett and hence the marital deduction. It is the possibility, not the probability, of such action that controls. See *Estate of Kyle v. Commissioner*, 94 T.C. at 845 (case in which we applied the principle that it is "the possibility, not the probability, that an interest will terminate or fail" that determines whether a surviving spouse's interest is a qualifying income interest for life). See also *Estate of Robertson v. Commissioner*, 98 T.C. 678, 685 (1992).

Respondent contends that neither the trustees nor the Shawnee County district court had the authority to alter the unambiguous terms of the trust agreement. The estate counters that the trust agreement was ambiguous and that the trustees' actions were intended to clarify the ambiguities and to arrange for the valid disclaiming of certain interests, as permitted under Federal and State laws, to preserve a marital deduction in a portion of the memorial trust.

Furthermore, the estate argues that, absent explicit words to the contrary, the decedent is presumed to have intended to qualify the memorial trust for the marital deduction. The estate further argues that Kansas and Federal law require construing trust instruments and wills in such manner as to preserve a marital deduction. The estate contends that the trustees and the Kansas probate court clearly acted in a proper and binding fashion in construing the memorial trust to preclude a termination pursuant to paragraph 2(e) during Mrs. Bennett's lifetime. The estate further contends that the rules and by-laws and the Shawnee County district court's order confirming them properly serve to memorialize this construction by the trustees and the probate court. Thus, the estate concludes that, under Kansas law, there never was even the potential for termination of the memorial trust during Mrs. Bennett's lifetime.

Legal rights and interests in property and transfers thereof are created and determined by State law, but the manner in which and the extent to which such rights and interests shall be subjected to Federal tax are determined by Federal law. *Helvering v. Stuart*, 317 U.S. 154, 161 (1942); *Morgan v. Commissioner*, 309 U.S. 78 (1940); *Estate of Sweet v.*

*Commissioner,* 234 F.2d 401 (10th Cir. 1956), affg. 24 T.C. 488 (1955). An order or judgment of a State trial court obtained or entered in a nonadversarial proceeding is not binding as between one or more parties to such proceeding and the United States with respect to income or estate tax imposed by Federal legislation. *Commissioner v. Estate of Bosch,* 387 U.S. 456 (1967); *Estate of Sweet v. Commissioner,* 234 F.2d at 404; *Brodrick v. Moore,* 226 F.2d 105 (10th Cir. 1955), affg. 123 F. Supp. 108 (D. Kan. 1954); *Brodrick v. Gore,* 224 F.2d 892 (10th Cir. 1955).

For example, in *Estate of Sweet v. Commissioner, supra,* the proceeding in the State court was instituted with the concurrence of the trustee and the beneficiaries under the trust for the sole and single purpose of circumventing the contention of respondent that the trust's author did not create two separate and distinct trust estates. The State proceeding was essentially nonadversarial in character, and the decree was obtained in collusion for the purpose of sustaining the claim for a marital deduction. The Tenth Circuit Court of Appeals in that case affirmed this Court's conclusion that the State court decree was not binding upon a proceeding in this Court.[10]

While we do not suggest that the trustees and the beneficiaries in the present case engaged in improper collusion with the Kansas probate court to obtain approval of the rules and by-laws and the disclaimers, nonetheless that proceeding was nonadversarial and was instituted for the sole purpose of obtaining a marital deduction that was not otherwise available under the original terms of the will and trust agreement. We find that the State court order is not binding upon this Court in our determination of the availability of the marital deduction and the estate tax to be imposed under Federal law. *Estate of La Meres v. Commissioner,* 98 T.C. 294, 311 (1992); *Estate of Nicholson v. Commissioner,* 94 T.C. 666, 673 (1990).

The actions taken by the trustees in this case seek to modify or amend the dispositive provisions of the memorial trust.

---

[10] The Tenth Circuit Court of Appeals has also articulated the general rule that "as between parties to an instrument a reformation relates back to the date of the instrument, but that as to third parties who have acquired rights under the instrument, the reformation is effective only from the date thereof." *Sinopoulo v. Jones,* 154 F.2d 648, 650 (10th Cir. 1946) (fn. ref. omitted).

As we held in *Estate of La Meres v. Commissioner,* 98 T.C. at 312:

While we will look to local law in order to determine the nature of the interests provided under a trust document, we are not bound to give effect to a local court order which modifies the dispositive provisions of the document after respondent has acquired rights to tax revenues under its terms. *Estate of Nicholson v. Commissioner, supra* at 673; *American Nurseryman Publishing Co. v. Commissioner,* [75 T.C. 271, 275 (1980), affd. without published opinion 673 F.2d 1333 (7th Cir. 1981)]; *Estate of Hill v. Commissioner,* 64 T.C. 867, 875-876 (1975), affd. in an unpublished opinion 568 F.2d 1365 (5th Cir. 1978). * * *

Thus, a valid reformation of a trust instrument may have retroactive effect under local law as between the parties to the instrument but not as to third parties, including respondent, who had previously acquired rights under the instrument. *Estate of Nicholson v. Commissioner,* 94 T.C. at 674. To hold otherwise would open "considerable opportunity for 'collusive' state court actions having the sole purpose of reducing federal tax liabilities". *Van Den Wymelenberg v. United States,* 397 F.2d 443, 445 (7th Cir. 1968).

Our foremost consideration in this case must be giving effect to the clear intent of the decedent. The rules for construing a trust document to determine such intent are similar to those governing construction of a will. Our first responsibility when the language and the meaning of a will or trust instrument are challenged is to determine whether conflict or ambiguity exists. *Estate of Graves v. Holland,* 457 P.2d 71 (Kan. 1969). If an analysis of the entire will or trust document does not yield any ambiguity or uncertainty, a court cannot employ rules of construction to modify or change the instrument and must enforce the instrument in accordance with its clear terms and provisions. *In re Estate of Pickrell,* 791 P.2d 41 (Kan. App. Ct. 1990), affd. 806 P.2d 1007 (Kan. 1991). Extrinsic evidence of intent, thus, is inadmissible, and the settlor's intent is determined from the four corners of the trust instrument. *Id.* We note that here no extrinsic evidence of intent has been proffered.

The Kansas Supreme Court has made its views on the modification of wills and trust instruments quite clear:

We would not encourage the suggestion that a court may wander from the actual words of a will into the region of conjecture as to what it is

reasonable to suppose the testatrix would have done had she contemplated a certain event happening. A court is not free to roam such unfenced fields of speculation. We refute the notion that any canon of construction entitles a court to indulge in its imagination and go into what the testatrix would have said had she anticipated a changed condition.

A court cannot correct a mistake made by a testatrix unless the mistake appears on the face of the instrument, and it also appears what would have been the will if the mistake had not occurred. The duty of the court is to construe not to construct the will. It is without power to modify the instrument for the purpose of making it conform to the opinion of the individual judge as to what constitutes an equitable distribution of the testator's property. Neither can it make a conjecture as to what a testatrix would have done had she foreseen the future and then build up a scheme for the purpose of carrying out what it thought would have conformed to the desire of the testatrix.

[*Estate of Graves v. Holland,* 457 P.2d at 77.]

The estate cites *Estate of Todd v. Commissioner,* 57 T.C. 288 (1971), and *Mittleman v. Commissioner,* 522 F.2d 132 (D.C. Cir. 1975), revg. T.C. Memo. 1973-112, to support its contention that the decedent is presumed to have intended to qualify the memorial trust for the marital deduction. Relying upon this presumed intention, the estate then argues that both Federal and Kansas law [11] require construing the trust agreement to "preserve" the marital deduction.

In *Estate of Todd* the trustees were given "conclusive discretion" to distribute, at least annually, to the testator's surviving spouse so much of the income of the trust as they thought should be paid to accomplish the purpose of the trust. We concluded that the surviving spouse had an absolute right to the income from the trust because the "conclusive discretion" of the trustees extended only to the amount of the income payments and was limited by the overriding necessity to accomplish the purpose of the trust. In reading the will as a whole and noting the layout and wording of the income and principal provisions of both the marital trust and the residuary trust, we held that the trust's only purpose was to secure the benefits of the marital deduction. Numerous references to the marital deduction were made in the part of the will establishing the marital trust. Texas law

---

[11] We need not discuss in depth *Jackson v. Jackson,* 536 P.2d 1400 (Kan. 1975), because that case discusses the proper apportionment of Federal estate tax, debts, and expenses incident to administration of an estate among the beneficiaries named in the testator's will, in the absence of a State apportionment statute. The surviving spouse, *to the extent her share of the estate qualified for the marital deduction,* was not to be charged with, or her portion reduced by, any part of the Federal estate tax imposed on the estate. See *supra* note 3.

supported our conclusion that a trustee's discretionary authority is limited and must comply with the purpose the testator reveals in the will.

In *Mittleman v. Commissioner, supra,* the U.S. Court of Appeals for the District of Columbia Circuit held that where a testator intends to create a trust qualifying for a marital deduction, ambiguities in his will should, if possible, be resolved in favor of the success of the endeavor. In that case, the District of Columbia Circuit went beyond the four corners of the will due to ambiguities in the document.

In both the *Estate of Todd* and *Mittleman* cases, thus, the testator did reveal an intention to create a trust qualifying for the marital deduction that was jeopardized by ambiguities in the will. Both cases concluded that ambiguities, when possible, should be resolved in favor of achieving the testator's stated intention.

In the case at issue, however, there are no ambiguities in either the will or the trust instrument. The decedent made no reference or statements of intent concerning a marital deduction that warrant going beyond the four corners of the will or the trust agreement. The estate does not suggest going beyond the four corners of the documents (i.e., extrinsic evidence of intent), but seeks instead to change what is clearly stated in the documents. The estate admits that under the terms of the trust agreement, the memorial trust does not qualify for a marital deduction, principally because of the possibility that the surviving spouse may not receive all of the income for life. The decedent's will did not change the trust agreement in any way. On the contrary, the will bequeathed the residue (the bulk) of his estate to the trust, with specific directions to the trustees that this bequest "be administered by them in accordance with the provisions [of the trust agreement]" and that the trustees "shall dispose of said property as a part of said Trust in accordance with the provisions thereof". See residuary bequest quoted in our Findings of Fact above.

We cannot allow the trustees and the beneficiaries to substitute their conjectures of the decedent's intent with regard to a marital deduction for the memorial trust. The trust agreement makes no mention of qualifying the memorial trust for the marital deduction. The decedent clearly sets forth the manner in which he expected the trustees to

administer and dispose of the assets of the trust. He expressly granted them certain discretion in carrying out his intent. We cannot accept the trustees' attempts through the rules and by-laws to rewrite the trust agreement to allow a marital deduction that neither the will nor the trust agreement provided for.[12]

Powers given to a trustee to transfer title to trust property can be exercised only in the manner and under the express conditions specified in the trust instrument. *In re Sutcliffe,* 433 P.2d 389, 396 (Kan. 1967); Kan. Stat. Ann. sec. 58-2405. Furthermore, a person named as trustee cannot accept the trust in part and disclaim in part: "This is true whether he purports to accept the trust only as to a part of the trust property, or only as to some of the duties." 2 Scott, Trusts 85 (4th ed. 1987); *In re Lord & Fullerton's Contract,* 1 Ch. 228 (1896).

A case cited by the estate supports this principle. The surrogate court of Nassau County, New York, in *In re Witz,* 406 N.Y.S.2d 671 (N.Y. Sur. Ct. 1978), held that the purported disclaimer by a trustee renouncing his right to invade the principal of the trust for the benefit of the income beneficiary, so that the estate could obtain a reformation of the trust to enable it to claim a charitable deduction, was of no effect. The surrogate court found that, in authorizing his trustee to invade the principal of a testamentary trust, the testator imposed an obligation upon the trustee that the trustee could not disclaim without renouncing his right to the letters of trusteeship. See Bogert, Trusts and Trustees, sec. 150, at 86 n.47 (rev. 2d ed. 1979).

We think the same rationale is applicable to the case at issue. The decedent gave the trustees the right to terminate the memorial trust and distribute its assets should the trustees determine that the trust was of such small size that it was difficult to manage and did not accomplish the purposes for which it was established. The trustees had the sole discretion to terminate the trust if it contained assets with a value of less than $100,000. In the rules and by-laws, the trustees attempt to renounce or disclaim this duty. They state that this provision was never intended to operate dur-

---

[12] As detailed in our Findings of Fact, some but not all of the beneficiaries purported to consent to various portions of the rules and by-laws.

ing the lifetimes of Mrs. Bennett and Ms. Radcliff, and they specifically disclaim any power to terminate the trust during those lifetimes. In addition, the trustees provide that the by-law shall not be amended during the lifetime of Mrs. Bennett or Ms. Radcliff.

The trustees are attempting to substitute their view of what the decedent intended for the clearly written language of the trust agreement. In three different sections in the trust agreement, the decedent provided that the medical and educational benefits could be paid from either income or principal. The trustees attempt to renounce that power and to provide instead that payments to those beneficiaries will be made only from principal during Mrs. Bennett's lifetime.

The trust agreement, in paragraph 6(j), also gives the trustees the power to determine, in their absolute and uncontrolled discretion, what is or is not income and what expense, cost, taxes, and other charges shall be charged against income or charged against principal. While the trustees attempt to renounce the power to make payments to the medical and educational beneficiaries from income during Mrs. Bennett's life, in effect, the trustees could allocate income to principal.

In summary, here neither the will not the trust agreement mentions qualifying the memorial trust for the marital deduction. The trust agreement, as written, admittedly does not qualify for the marital deduction. The dispositive provision of the will (residuary bequest) twice directs the trustees to administer the assets "in accordance with the provisions [of the trust agreement]" and to dispose of the property "in accordance with the provisions [of the trust agreement]". There are no ambiguities to be resolved here. The interrelatedness of the various provisions of the trust agreement and the cross-references therein leave no doubt that the decedent intended to give the trustees the powers, duties, and discretions contained therein. The decedent disposed of his property in a manner to care for numerous groups of the natural objects of his familial concerns and bounty. Nothing in the will or the trust agreement can be read as a plan to qualify the memorial trust, in whole or in part, for a marital deduction. The estate is not asking this Court to construe the documents but to rewrite them.

The trustees are attempting to disclaim powers, duties, and discretions that would amount to a renunciation of their trusteeships. Such a renunciation cannot be effective, particularly where it is solely for the purpose of changing the Federal tax results of this case. Mrs. Bennett is not ensured of having a qualifying income interest for life, and the memorial trust does not qualify for the marital deduction.

## Validity of Disclaimers

Respondent also questions the validity of the disclaimers executed by the medical beneficiaries. Respondent contends that those disclaimers do not satisfy the requirements of section 2518. First, respondent asserts that the disclaimers were not filed in a timely manner as required by State law and, thus, are not valid under State law. Secondly, respondent asserts that the medical disclaimants received a quid pro quo, in the form of reimbursement of their medical insurance premiums, in violation of section 2518(b)(3).[13]

Respondent asserts that the requirement of section 2518(b)(4), that the interest pass "without any direction on the part of the person making the disclaimer" to a person other than the disclaimant is, in effect, a requirement that the disclaimer be valid under State law. Since the disclaimers were filed with the Shawnee County district court on May 30, 1986, 9 months and 3 days after the date of the decedent's death, respondent concludes that they are untimely under local law and are not qualified disclaimers under section 2518.

The medical disclaimers meet the first two requirements of the Federal qualified disclaimer statute. The first requirement, that the disclaimers be in writing, has been met. Sec. 2518(b)(1). The second requirement, regarding the delivery of the disclaimers, has been met. Section 2518(b)(2) clearly states that the written disclaimer must be *received* by the transferor of the interest (i.e., the decedent's estate) or his legal representative (i.e., Donald Paxson or Mrs. Bennett as

---

[13] Respondent contends that the trust agreement did not give the medical beneficiaries any right to reimbursement for medical insurance premiums, and therefore they received these additional benefits in exchange for their disclaimers. The estate responds that the trust agreement provides for the payment of "medical care", and that the payment of medical insurance premiums is commonly included within the definition of medical care. See sec. 213(d)(1)(C). Since respondent's first argument is dispositive of the issue of the validity of the medical disclaimers, we need not delve into this argument.

coexecutors) no later than 9 months after the date of death. Sec. 25.2518-2(c)(5), Gift Tax Regs. Mr. Paxson testified that he received the executed medical disclaimers on or before May 27, 1986, the date 9 months after the decedent's death. Therefore, these medical disclaimers meet the timely delivery requirement of section 2518(b)(2).[14]

However, a disclaimer will not be treated as a qualified disclaimer under section 2518 unless it is effective under applicable local law because State law determines whether or not a property interest has passed. See *Estate of Dancy v. Commissioner,* 89 T.C. 550 (1987), revd. on other grounds 872 F.2d 84 (4th Cir. 1989). Section 2518(b)(4) requires that the interest pass, without direction from the disclaimant, to either the surviving spouse or to a person or persons other than the disclaimant. Consequently, there must be a valid passing of an interest under State law requirements before a valid passing of an interest can be considered to have occurred for Federal estate tax law purposes.

Section 59-2291 of the Kansas Statutes Annotated (1983 & Supp. 1990) sets forth the requirements for a disclaimer of an interest in property:

(a) A person or the personal representative of a person may disclaim in whole, in part or in an undivided part any real or personal property, or any interest therein or power thereover, passing upon death of another to such person as: (1) Heir; (2) next of kin; (3) devisee; (4) legatee; (5) a person succeeding to a disclaimed interest; (6) beneficiary under a testamentary instrument; (7) beneficiary under an insurance policy; (8) joint owner with a right of survivorship in real or personal property, to the extent the survivor may take more than the survivor's equitable portion of the property; (9) a person named to take on the death of the other person; (10) donee of a power of appointment; (11) beneficiary under the terms of an *inter vivos* trust; or (12) a person designated to take pursuant to a power of appointment exercised by or under a testamentary instrument.

(b) Disclaimer pursuant to this act shall be made by filing a written instrument and giving notice thereof in the manner hereinafter provided. The instrument shall: (1) Describe the property, interest or power subject

---

[14] This issue has been addressed in a footnote of a memorandum opinion of this Court:

While the parties focus on the date the disclaimer was filed with the probate court, sec. 2518(b)(2) focuses on the date the disclaimer is received by the transferor or the transferor's legal representative. Sec. 25.2518-2(b)(2), Gift Tax Regs. In this case, the "transferor" was Chester's estate and the "transferor's representative" was Donald. As the executor of Chester's estate, Donald received the disclaimer on the date he executed it as petitioner's executor. In other words, the disclaimer, which sec. 2518(b)(1) requires to be in writing, was delivered upon execution. [*Estate of Fleming v. Commissioner,* T.C. Memo. 1989-675, 58 TCM 1034, 1036 n.2, 58 P-H Memo. T.C. par. 89,675, at 3481 n.2 (1989), affd. 974 F.2d 894 (7th Cir. 1992).]

to the disclaimer, (2) contain a declaration of disclaimer and the extent thereof and (3) be signed and acknowledged by the disclaimant.

Unlike the Federal disclaimer statute, however, Kansas law requires the disclaimer instrument to be *filed* within 9 months after the date of the decedent's death. Kansas Statute Annotated section 59-2292 (1983 & Supp. 1990) provides as follows:

(a) The disclaimer instrument shall be filed within nine months after the latest of: (1) The death of the decedent or the donee of the power, as the case may be; (2) if the taker of the power, property or interest is not then finally ascertained or if the taker's interest has not become indefeasibly fixed both in quality and in quantity, the date that the taker becomes finally ascertained and such taker's interest becomes indefeasibly fixed both in quality and in quantity; or (3) the date when the taker of the property, interest or power attains the age of 21 years.

(b) The disclaimer instrument shall be filed and recorded in the district court in which the estate of the decedent or the donee of the power is or may be administered. Upon filing the disclaimer instrument, the disclaimant shall give notice of the disclaimer by personal delivery or sending, by certified mail, a copy of the instrument to the transferor, or the personal representative of the transferor, of the property, interest or power or to the holder of the legal title to the property to which the interest or power relates.

The statute directs that the disclaimer be filed and recorded in the district court in which the estate is or may be administered. Kan. Stat. Ann. sec. 59-2292(b) (1983 & Supp. 1990). The statute then directs that, upon the filing of the disclaimer instrument, the disclaimant shall give notice of the disclaimer to the transferor, or his personal representative, of the property. Kan. Stat. Ann. sec. 59-2292(b).

The medical disclaimers in this case do not meet State law requirements. The disclaimers were not timely filed. The disclaimers were not filed with the Shawnee County district court until May 30, 1986, 9 months and 3 days after the decedent's death. In fact, the Shawnee County district court has no record at all of the filing of Marquerite Laden's disclaimer. The estate has not established that her disclaimer was ever filed, and we must conclude that it was not filed. See *supra* note 6. Although the Kansas statute does not explicitly indicate the consequences of an improperly filed disclaimer, we think the result would be the same as indicated by section 20.2056(d)-1(b)(2), Estate Tax Regs.: "If the disclaimer is not a qualified disclaimer, the interest in

property [is] considered as passing from the decedent to the person who made the disclaimer as if the disclaimer had not been made". A fortiori, if the disclaimer is never filed, the disclaimer would be invalid and "as if the disclaimer had not been made."

Thus, in the absence of valid and qualified disclaimers, the three medical beneficiaries potentially could draw upon all of the assets of the memorial trust to cover their potentially catastrophic medical expenses.[15] In other words, the trustees have the power potentially to appoint all of the property of the memorial trust to persons other than the surviving spouse. Sec. 2518(b)(4). Consequently, no specific portion of the memorial trust is preserved in which Mrs. Bennett exclusively has a qualifying income interest for life. Sec. 2056(b)(7)(B)(ii)(II). As a result, we hold that no marital deduction is allowable in regard to the memorial trust.

The estate contends that the medical disclaimers do satisfy the requirements of the Kansas disclaimer statute and/or the requirements of Kansas common law. The estate argues that the common law of Kansas supports the finding of valid disclaimers in this case despite their untimely filing. The estate relies upon *In re Estate of Ramsey,* 622 P.2d 626 (Kan. 1981). In that case the Kansas Supreme Court held that a disclaimer, filed 18 months after the decedent's death but within 9 months of the Sedgewick district court's entry of an order regarding a petition on the construction of the will, was timely filed.

The facts of the *Estate of Ramsey* case are distinguishable. Mildred Ramsey died on January 2, 1977. She was survived by three children: Jay, Clinton, and Jane. During her lifetime, Mrs. Ramsey accumulated three sections of farm land in Kansas. Prior to her death, and prior to writing her will, Mrs. Ramsey gave one section of land to her son Jay. However, when she wrote her will, Mrs. Ramsey expressed her intent that each of her children receive an equal share of her

---

[15] Our conclusion that Marquerite Laden's disclaimer was not filed disposes of the marital deduction issue. The estate has not proved that Ms. Laden's medical disclaimer was ever filed with the Shawnee County district court as required by Kansas law. Thus, Ms. Laden is entitled to the medical benefits as set forth in the trust agreement. Her medical needs alone could potentially drain the memorial trust, leaving no qualifying interest for Mrs. Bennett. However, even if we were to assume that the disclaimer was filed and was somehow misplaced by the Shawnee County district court, the outcome remains the same as our further discussion in the text explains.

estate. In her will, Mrs. Ramsey bequeathed one section of land to each child and specifically identified which child would receive which section of land.

Mrs. Ramsey bequeathed to Jay in her will the same section of land that she had already given him prior to writing her will. However, her will stated that Jay's section "shall be considered a part of my estate and the appraisal made as above provided in order to carry out my intentions that each child of mine shall share equally in my estate." *In re Estate of Ramsey, supra* at 628.

In November of 1977, a petition to construe Mrs. Ramsey's will was filed. In April of 1978, the executors of the estate filed their inventory and valuation of the assets of the estate, as well as a valuation of the section of land that Mrs. Ramsey had given to Jay before her death. In June of 1978, the district court found that the will was clear and unambiguous, included Jay's section of land as part of the estate, applied the equalization formula provided in the will to the three sections of farm land, and ruled that Jay should pay into the estate $12,100, that Clinton should pay into the estate $39,700, and that Jane should receive $51,800 from the estate.

On July 10, 1978, 18 months after the death of Mrs. Ramsey, Jay filed a disclaimer to any and all interest in the estate of his mother. The district court held that the disclaimer was filed in a timely manner under the second clause of Kansas' disclaimer statute.

The *Estate of Ramsey* case does not help the estate. Although the Kansas Supreme Court stated that "Common law and public policy require that a beneficiary be given a reasonable time under all the facts and circumstances within which to file a disclaimer", the court was recognizing and applying this principle to the *statute's* filing requirements.[16] *In re Estate of Ramsey, supra* at 630 (citing *Strom v. Wood,* 100 Kan. 556, 164 P. 1100 (1917)). In *Estate of Ramsey,* the disclaimant was able to demonstrate that his disclaimer fell within the second clause of Kansas Statutes Annotated sec-

---

[16] Courts apply the reasonableness standard exclusively only when there is an absence of a controlling statute. Adams, "Disclaimer Statutes: New Federal and State Tools for Postmortem Estate Planning", 20 Washburn L.J. 42, 53 (1980); see also *Keinath v. Commissioner,* 58 T.C. 352, 359 (1972), revd. on other grounds 480 F.2d 57, 61 (8th Cir. 1973) (Tax Court and Court of Appeals held that, although validity under State law is a necessary condition, it is not the final determinant).

tion 59-2292 (1983 & Supp. 1990): a disclaimer can be filed within 9 months of the time the interest became indefeasibly fixed both in quality and quantity. The Kansas Supreme Court adopted the comments of the California Court of Appeals in *Estate of Koplin,* 70 Cal. App. 3d 686, 694, 139 Cal. Rptr. 129 (1977), in construing that State's disclaimer statute: "public policy is best served by allowing a beneficiary to make a disclaimer of his interest at that point in time where the beneficiary is best able to weigh the alternative possibilities of his actions." *In re Estate of Ramsey, supra* at 630. The Kansas Supreme Court found that the disclaimant in *Estate of Ramsey* was not in a position to weigh the desirability and effect of disclaiming certain property until after the Sedgewick district court had ruled upon the petition for the construction of the will. "We agree, the statute obviously contemplates factual situations where a beneficiary under a will cannot make an intelligent decision about the effects of a disclaimer within nine months of the death of the decedent." *In re Estate of Ramsey, supra* at 630.

However, this is not the situation presented in the instant case. The estate has not presented any evidence in this case demonstrating that the medical beneficiaries' disclaimers fall within the second clause of Kansas Statutes Annotated section 59-2292. None of the medical beneficiaries testified, so this Court has no basis upon which to decide that they were unable to weigh the consequences of their actions within 9 months of the decedent's death. The estate merely argues that, despite the clear timing requirements of the Kansas disclaimer statute, the Kansas Supreme Court would apply the common law reasonableness standard. We think the Kansas Supreme Court itself has demonstrated otherwise. Moreover, Marquerite Laden's disclaimer was never filed. See *supra* note 15.

The timing requirements for the filing of disclaimers under the Kansas disclaimer statute are clear and require compliance for validity. Thus, in the absence of valid medical disclaimers in this case, the language of the trust agreement controls, and it has failed to create a qualifying income interest for Mrs. Bennett's life in any portion of the memorial trust. As a result, the estate is not entitled to a marital deduction for any portion of the memorial trust.

The estate also cites *In re Estate of Witz,* 406 N.Y.S.2d 671 (N.Y. Sur. Ct. 1978), to support its assertion that the beneficiaries' disclaimers should be given effect despite noncompliance with the Kansas disclaimer statute. In that case, a disclaimer was filed by the noncharitable income beneficiary of a testamentary trust, wherein she disclaimed her right to invade the principal of the trust so that the estate could obtain a reformation of the trust to enable it to claim a charitable deduction under the Tax Reform Act of 1969. The disclaimer satisfied the Federal requirements of section 2518 but failed to comply with the New York disclaimer statute's requirements. The disclaimer was neither acknowledged nor served upon the trustee and was filed in the court 2 days after the filing date prescribed by statute. The surrogate court held that, since the purpose of the reformation of the trust was to comply with the provisions of the Internal Revenue Code, the court would treat the disclaimer as in substantial compliance with the State statute. "To hold otherwise would be to exalt form over substance and result in an injustice because of counsel's [a Connecticut firm] possible unfamiliarity with the New York law." *In re Estate of Witz, supra* at 673. The surrogate court also quoted the conference committee report on Public Law 94-455: "If the requirements of the provisions are satisfied, a refusal to accept the property is to be given effect for federal estate and gift tax purposes even if the applicable local law does not technically characterize it as 'a disclaimer'." *Id.* The court stated that the committee report indicates that the Internal Revenue Service will recognize a disclaimer if it complies with the specific provisions of the Internal Revenue Code and not local law.

Respondent disagrees with the New York surrogate court's holding in *In re Estate of Witz, supra,* and cites 5 Bittker, Federal Income Taxation of Estates and Gifts 121-61 (1984), to support the position that a valid disclaimer must comply with both State and Federal law for Federal tax purposes:

In enacting IRC [section] 2518, Congress unaccountably failed to address explicitly two fundamental issues: whether a disclaimer must be effective under state law to qualify under IRC [section] 2518, and whether IRC [section] 2518 leaves room for application of pre-1976 case law or, instead, preempts the field.

1. *Validity under state law.* Although IRC [section] 2518 does not explicitly require disclaimers to be effective under state law, this requirement is implicit in IRC [section] 2518(b)(4), which provides that the disclaimed interest must pass without any direction by the disclaimant to a person other than the disclaimant (unless the disclaimant is a decedent's surviving spouse). A disclaimer that is ineffective under state law cannot have this effect, since neither IRC [section] 2518 nor any other federal law prescribes rules for the passing of disclaimed property interests. Moreover, although the Internal Revenue Code does not always eschew make-believe, it is inconceivable that Congress would have wanted a disclaimed interest to be treated "as if the interest had never been transferred" to the disclaimant, if in fact it was not only transferred to the disclaimant *but stayed with him* because an attempted disclaimer was invalid under local law.

We agree with Professor Bittker's rationale with respect to the validity of a disclaimer. We think that the surrogate court, in the particular situation it faced, decided to overlook out-of-State counsel's noncompliance with New York State law and to treat the disclaimers as valid in order to carry out the testator's *expressed* intent that the assets of the trust were to be paid in part to a noncharitable beneficiary and in part to a charity.

The situation in this case is distinguishable from the situation present in *In re Estate of Witz, supra,* and we are not bound to follow the factually based decision of a New York surrogate court in this case. Furthermore, the Supreme Court of Oklahoma has spoken to this issue and with more persuasive reasoning. In *In re Estate of Griffin,* 599 P.2d 402 (Okla. 1979), the Supreme Court of Oklahoma held that the statutory disclaimer filed by the decedent's husband after the 6-month filing period [17] for disclaimers had expired was not effective. [18] The Oklahoma Supreme Court held that the State disclaimer statute is mandatory and that two questions needed to be considered: (1) Was the disclaimer timely filed, 7 months having elapsed since the decedent's death, and (2) if the disclaimer was not timely filed, was it nevertheless effective upon filing. *Id.* at 405. The Oklahoma Supreme Court answered both questions in the negative, holding that a disclaimer does not bind a beneficiary nor confer benefits unless it is filed in accordance with statutory provisions, and

---

[17] As of Oct. 1, 1979, the filing period for disclaimers was extended to 9 months.

[18] The terms of Oklahoma's disclaimer statute are similar in structure and requirements to those of the Kansas disclaimer statute. Okla. Stat. Ann. tit. 84, secs. 24-31 (West 1990).

that, thus, compliance with the filing requirements of the State disclaimer statute is a condition precedent to an effective disclaimer. *Id.* at 406. The Oklahoma Supreme Court further stated:

The object of the disclaimer is not solely to provide an alternative method of conveyance. A beneficiary is equally divested whether he parts with his interest by gift or by disclaimer. One of the more important features of disclaimer is the concomitant tax treatment. In enacting the disclaimer statute, the Legislature created a method whereby a beneficiary may prevent the vesting of title and thereby accomplish a conveyance without the necessity of paying a gift tax. *Keinath v. C.I.R.,* [480 F.2d 57 (8th Cir. 1973)]. But, the privilege conferred by the disclaimer statute cannot be enjoyed without satisfying certain conditions. In order to be effective, the disclaimer must be * * * duly filed. [*In re Estate of Griffin,* 599 P.2d at 405-406.]

The court noted that it was not holding that the decedent's husband was powerless to convey his interest after the expiration of the 6-month filing period, only that such conveyance could not be accomplished through a statutory disclaimer if not filed in accordance with the provisions of the statute. *Id.*

We think that the Kansas Supreme Court also would require compliance with its State disclaimer statute in order to effectively avoid the conveyance of certain property to the disclaimant. Thus, we adhere to the recognized proposition that the disclaimer of a property interest that would otherwise pass under a given State's laws must comply with that State's requirements to be considered valid.

*Applicability of Section 2518(c)(3)*

The estate also argues, in the alternative, that the medical disclaimers satisfy the terms of section 2518(c)(3) which treats certain transfers as disclaimers. Section 2518(c)(3) provides as follows:

SEC. 2518(c). OTHER RULES.—For purposes of subsection (a)—

\*   \*   \*   \*   \*   \*   \*

(3) CERTAIN TRANSFERS TREATED AS DISCLAIMERS.—A written transfer of the transferor's entire interest in the property—

(A) which meets requirements similar to the requirements of paragraphs (2) and (3) of subsection (b), and

(B) which is to a person or persons who would have received the property had the transferor made a qualified disclaimer (within the meaning of subsection (b)), shall be treated as a qualified disclaimer.

One of the requirements of section 2518, as noted above, is that a disclaimer be effective under local law to pass the interest without any direction on the part of the person making the disclaimer, sec. 2518(b)(4): "As a result, [under section 2518 before a 1981 amendment] a disclaimer that is ineffective under local law cannot be treated as a qualified disclaimer for purposes of the Federal estate and gift taxes, even if the disclaimant timely transfers the property to the individual who, under local law, would have received the property if there had been an effective disclaimer." H. Rept. 97-201 (1981), 1981-2 C.B. 352, 392.

Thus, in 1981, Congress amended section 2518 to achieve greater uniformity of treatment by providing that certain transfers will be treated as disclaimers:

In order to provide uniform treatment among States, the committee believes that *where an individual timely transfers the property to the person who would have received the property had the transferor made an effective disclaimer under local law, the transfer will be treated as an effective disclaimer for Federal estate and gift tax purposes* provided the transferor has not accepted the interest or any of its benefits.

*        *        *        *        *        *        *

A qualified transfer made by an individual is a written transfer made by that individual within 9 months of the transfer creating his interest (or, if later, within 9 months of the date the individual attains age 21) and before the individual accepts the interest or any of its benefits. A transfer will not be considered a transfer of the entire interest in the property if, by reason of the transfer, some or all of the beneficial enjoyment in the property returns to the transferor or the transferor has any period after the transfer to control the beneficial enjoyment from the property.

[H. Rept. 97-201, *supra,* 1981-2 C.B. at 392; emphasis supplied.]

The transferor (i.e., the beneficiary) referred to in section 2518(c)(3) is not the same transferor of section 2518(b) (i.e., the estate or executor). Section 2518(c)(3) assumes that a transfer to the beneficiary has already occurred under local law because a disqualified disclaimer did not avoid the transfer. That beneficiary can still avoid the effects of the disqualified disclaimer by making a written transfer to the person who would have received the property (e.g., a surviving spouse) had the beneficiary made an effective disclaimer.

Section 2518(c)(3) should not be viewed as a catchall provision to save defective or disqualified disclaimers but as an entirely new relief provision under which, after a disclaimer has been disqualified, the would-be disclaimant makes an actual written transfer to the person who otherwise would have received the property had the disclaimer been valid under local law. The relief of section 2518(c)(3) was designed to eliminate the gift tax consequences for the beneficiary who had made a disclaimer that was disqualified and who then made an actual written transfer to another individual.[19]

In this case, the medical beneficiaries attempted to disclaim a portion of their interests in the memorial trust. The estate argues that these disclaimers are valid, or in the alternative, satisfy the requirements of section 2518(c)(3). We do not agree. We do not find the medical disclaimers to be qualified disclaimers nor do we find that the medical beneficiaries have satisfied the requirements of section 2518(c)(3) by having made, within the requisite 9-month period, actual written transfers of their interests in the memorial trust to the person who otherwise would have received those interests had the disclaimers been valid under local law, i.e., Mrs. Bennett.

## Alternative Arguments

Having found that the trustees' renunciation of powers and the medical disclaimers are not valid, we need not address the validity of the disclaimers on behalf of the unborn, unadopted, or otherwise unidentified educational beneficiaries.[20] We leave those decisions to the future and to the appropriate State courts.

---

[19] Such transfers of property normally incur gift taxes. However, under sec. 2518(c)(3), gift tax liability is averted by treating the actual transfer of property as if it had passed under a qualified disclaimer (i.e., as if the property had never passed under the terms of the will to the beneficiary in the first place). H. Rept. 97-201 expressly states that "the individuals' direction of the transfer to the individual who would have taken under local law pursuant to an effective disclaimer will not be construed as an acceptance of the property". H. Rept. 97-201 (1981), 1981-2 C.B. 352, 392.

[20] Although not contesting the timeliness of the educational disclaimers, respondent asserts that those disclaimers are not valid because they were not in the best interests of the beneficiaries. The estate asserts that there is no such statutory requirement for a disclaimer in order for the disclaimer to be irrevocable and effective and that, therefore, the educational disclaimers in this case are valid under both State and Federal law. The estate points out that, if a guardian violated his or her fiduciary duty by executing the disclaimer, the beneficiary may have a cause of action against the guardian, but that such breach in and of itself does not render the disclaimer invalid. Having found that the estate is not eligible for a marital deduction because of the invalidity of the trustees' renunciation of certain powers and of the medical disclaimers, this Court need not rule upon these other matters.

Thus, to reflect the above holdings and our holdings in our separate opinion on the valuation issues, T.C. Memo. 1993-34, filed this same day,

*Decision will be entered under Rule 155.*